The October seating. We have two cases this morning, both with their challenges, but counsel will shed much light on all of that, I'm sure. First case is No. 24-20525, C.H. Offshore v. Mexiship Ocean. Good morning, Your Honors. May it please the Court, Keith Letourneau for Appellant C.H. Offshore. C.H. Offshore meets the requirements for Rule B attachment under the Acqua Stoli standards. They had a valid prima facie case, admiralty claim for breach of a maritime contract, a airboat charter, as well as a conversion of its vessel, which is still being held by Mexiship Mexico. Secondly, the defendant, Mexiship Mexico, was not found within the district in accordance with the standards set forth in Rule B. Defendant's property is within the district, and there are no statutory maritime bars to attachment. The standard of review in this case for decisions to vacate a maritime attachment is abuse of discretion, and a district court abuses its discretion when it ignores or misunderstands the relevant evidence. And in this case, the relevant evidence is the seahorse settlement agreement, which the court's order did not address in any way. The seahorse settlement agreement defines the term Mexiship to mean Mexiship Ocean CCC SADCV, which means Mexiship Mexico. It was signed by the CEO of Mexiship Mexico, and the monies are to be paid to Mexiship Mexico under that settlement agreement. In fact, the language specifically in the settlement agreement reads, seahorse shall then refund the balance sum of U.S. $808,238.72 less any bank charges which may be incurred in the remittance process to Mexiship. But the evidence is mixed, because the other evidence in the record shows that it went to Mexiship Texas, and that Mexiship Texas has the bank account in Texas. Well, Your Honor, it did go back to Mexiship Texas's bank account, but that is a I won't call it a ministerial task, but it is essentially there has to be a bank account, and that is the bank account that Mexiship Mexico designated. And in fact, it says in the agreement, Mexiship's designated bank account for the purpose of receiving the refund is as follows. And then it defines Mexiship Ocean CCC LLC as the recipient. But the district court found that it was Mexiship Texas's account and money, so that I guess we're talking about the third Occult Stability Factor. It wasn't found in the district. Well, Your Honor, again, if you look at the contractual relationship between the parties, Mexiship Mexico's CEO, Armando Perez, he signed that settlement agreement, and he said that that money was going to be paid to Mexiship Mexico. If you look at his deposition transcript, and let me draw your attention to a variety of sites that demonstrate the intention was always to have these monies paid to Mexiship Mexico. ROA 1718. Perez, in his capacity as CEO of Mexiship Mexico, he writes to Seahorse, I write to you to request a status of the return of Mexiship deposit to T.C. Queen. ROA 1721 and 22. Rolando Ramon, acting on behalf of Mexiship Mexico, wrote to Seahorse, quote, Mexiship believes we negotiated a fair market value price for the T.C. Queen. Our position further strengthened with a transfer of deposit to Seahorse of $850,000 USD. ROA 1723 to 24. These record sites, would it be fair to say that what they're showing is Mr. Perez controls this money? Exactly, Your Honor. But he's the majority owner of the Mexico entity, he's directing the refund go to the Texas financing arm. So your argument, that's de facto control, but wouldn't it also be maybe as amenable to, this is just an alter ego, he's commingling these various companies. Is that sort of the predicament you're in? Yes, Your Honor, exactly. But you've been denied both. Correct, that's correct. Essentially our position is we have a prima facie case, will be attachment, and alternatively we have a Texas state attachment vehicle that would enable us to attach all of the funds based upon the fact that they are present within the district. So that's what we ask the district court to do, is to enable us to amend the complaint to pursue the Texas state attachment. Are we here on appeal over the denial of the motion for leave to amend, or are you also challenging the merits of the vacator of the Rule B attachment? Absolutely both, Your Honor. So the district court, I thought, indicated in its order that you were going to abandon your Rule B attachment if you were allowed to amend the complaint. So that's not accurate. That is not correct, Your Honor. In fact, in our response to Mexiship Texas's motion to vacate, we specifically requested that the court reserve ruling on our motion to amend pending the results of discovery. But you didn't file a motion for leave to amend, did you? We did, Your Honor. We did in the sense that at the oral hearing on April 2nd, 2024, I made reference to the fact that we wanted to amend the complaint, assuming we had the evidence to do so. At that time, we didn't have the evidence. The limited amount of discovery that we were enabled to do gave us the grounds, we believe, that are sufficient to amend the complaint. Why didn't you file a motion? I mean, it's in this proposed order, but that's an odd posture to me. Well, Your Honor, we didn't file the motion because we were directed by the court to file a draft order after the close of discovery. And that's what we did. And in that draft order, we included all of that information. Stepping back just a little bit, is there really no strong authority as to when there's an attachable property interest in a bank account sufficient for a Rule B plaintiff? In other words, would you agree with me that the Texas entity has legal title to that account? I would not agree with that, Your Honor, because of the way Mr. Perez was manipulating and using those monies. Essentially, what he did is he took $850,000 out of that account, and then he converted it for the purpose of Mexiship Mexico to consummate a deposit for a bare-boat charter. I think I understand the facts, and I admit that it's sort of opaque. We just don't know much about the corporate structure here. But what about that? I sometimes ask combined questions. What about authority as to when a bank account, what's the determinative? Your Honor, the case that comes to mind is the Riyadh Bank case. And the Riyadh Bank case says that a bank account is located where the monies are. And bank accounts . . . Well, it's where the monies could be withdrawn or deposited and that sort of thing. I mean, the question in that case was there was this branch office, or it wasn't a branch actually, and they didn't do anything more than letters of credit or whatever they did in the country. And so, I thought our court held that the money wasn't there, wasn't in the district. But I'm not aware of anything that defines in this particular context. I mean, I think what we're seeing is we're seeing the commingling of funds by Mr. Perez. But you do accept it's your burden to show at this stage some control ownership over the money? You think you have with the Seashore email? Your Honor, I think our burden at this stage of the proceedings, we are at the Rule E-4-F stage. And at that stage of the proceedings, the Fifth Circuit has not ruled as to what the standard is. But it appears to be the general trend with the circuit courts that it's probable cause to believe that our allegations are well-founded. And I think we have more than met that burden based upon the information that we were able to. What's the timing? I mean, when you filed the complaint, the property was still with Seashore, correct? Your Honor, it's only upon attachment that it's even arguably in the Texas Entities Control. Well, if I understand your question correctly, the property, by the time we attached, the property was already in the Bank of Connecticut. Yes. But is that also true as to when you filed the complaint? We filed the complaint, you know, after the property was already in the bank account. Oh, okay. So, again, I think that if we're enabled to amend the complaint, because I think that we have clear demonstration of commingling of property, Mr. Perez testified at one point in time during the deposition that when I filed, what does the term we mean? Basically, he said, we means me, you know, when it comes to all of this. He was basically using all of these corporate entities for his own purposes. And I think it's important to keep in mind the underlying premise behind what this company structure was doing. With respect to our company, CHO Offshore, they basically got a bareboat charter with our vessel. They then stopped paying charter hire, and they have our client's vessel. It's still operating in Mexican waters, and it's under contract between Mexico Ship and Pemex. What's the status of the Mexico litigation? It is absolutely in, you know, it's languishing. Nothing happens that we're aware of. You won it in an early stage. Yes, but there are so many different appeals that are happening in the Mexican proceeding. There's just no activity that we're aware of. The other aspect of So what if we conclude that the evidence isn't there at least yet to indicate the claim that you want to make to this fund in the McAllen Bank? There's ambiguity. You're saying that what you do have is enough to show probable cause, perhaps. That's something we can consider. But it does seem to me the most difficult part of this case is that there's not clarity to what is going on, and you have had discovery. That may be in part why the judge ruled in the way he did, that the game had been played, and you hadn't yet shown what you needed to show. Do you have any reaction? I'm sure you have a reaction. What is it? Your Honor, candidly, I think that we have shown enough. The district court judge, in his ruling, made no reference at all in terms of allowing us to amend our complaint. The standard, essentially, is the district court must possess substantial reason to deny a request for leave to amend, and what the district court said in his order was we didn't set forth a substantial, we didn't demonstrate good cause to file a third amended complaint. Well, actually, it would have been a second amended complaint, but the court didn't say what the substantial reason was, and frankly, we do have a substantial reason. We have fraud with respect to our client's vessel, and we also have it with respect to the Seahorse vessel. They basically put a deposit on this vessel. Then they apparently engaged in the perpetration or attempted perpetration of a fraud by coming up with a fraudulent performance guarantee. Seahorse got wind of that, and they put a kibosh on the deal, but if they hadn't done that, then this would have been a second vessel that was basically stolen by Nexus Ship Mexico and placed in service, and the intention was to go, again, charter it with Pemex. So it's tantamount to a criminal organization in terms of how they're operating their business, and that, to me, has to be sufficient to demonstrate, you know, ground for us to amend our pleadings. If you can amend and allege both, they are mutually exclusive. That's correct, Your Honor, and if they're mutually exclusive, if we prevail on the alter ego arguments, then essentially Nexus Ship Mexico is now here, and then we have a Texas State attachment action under TRCP 61.001 and 02. Back to Judge Higginson's question about the title to the bank account in Texas. Is there any evidence that supports that it's Nexus Ship Ocean's bank account? I mean, it's Nexus Ship Texas's, isn't it? It is Nexus Ship Texas's bank account, Your Honor. And the money was wired to Nexus Ship Texas, to that bank account? That is correct. Despite what the settlement agreement says? Despite what the settlement agreement says, but that's . . . Well, so it strikes me, then, I mean, what proof is there that Nexus Ship Ocean's property is in the Southern District of Texas? Well, Your Honor, I think what the proof is is that Mr. Perez was using all of this without any structure whatsoever. There's no loan agreement. There's no transaction of any kind between these entities. He's basically taking money from one, it was called Nexus Term Gas, two million dollars without a loan agreement, without any documentation whatsoever, transfers it to Nexus Ship Texas. Nexus Ship Texas then takes $850,000 out of that. Perez does it, actually, instructs it, and then it goes overseas to make the deposit. For Seahorse? For Seahorse. This is all without any structure. There's no loan . . . Well, but, I mean, it just strikes me that your Rule B attachment's going to have some tough sledding, because all this sounds like disregarding corporate entities and disregarding forms and disregarding who has the actual title to this bank account or the funds, especially if Nexus Ship Texas sent the funds over and then got the funds back. I mean, it doesn't suggest that Nexus Ship Ocean has any ownership, any property in that account. Well, Your Honor, respectfully, I disagree, given . . . I mean, Perez does, but that's different than Nexus Ship Ocean. I mean, it just sounds to me like your Rule B attachment's not viable, even if the alter ego is. Well, Your Honor, but if you look at the Seahorse settlement agreement, that is a document that Mr. Perez signed as CEO of . . . and I'm out of time, Your Honor, but that's a document that Mr. Perez signed as CEO of Nexus Ship Mexico, and he directed that the monies be returned to Nexus Ship, a defined term which means Nexus Ship Mexico. All right, Counsel. Thank you, Your Honor. May it please the Court, two things, obviously, that we pointed out in our briefing, in contrary to what Mr. Letourneau was arguing. The appellant did not demonstrate that Nexus Ship Mexico had property in the district. They may have had probable cause at the beginning in the ex parte application for writ of garnishment, but when it all came out, we traced the funds clearly showing that Nexus Ship Mexico never even had a claim to these funds. You traced it, but the district court doesn't . . . practically doesn't acknowledge the Seashore settlement agreement, much less the email. Well, we argued about that, Your Honor, with respect to the language of the settlement agreement itself. It says, for the purposes of receiving the refund only. Right, I know. I know you argued, and so it's not critical of you, but when I look at this district judge's final judgment vacating the writ of garnishment, there's no law cited, and there's not even acknowledgment of the decisive set of facts. With respect to the fact . . . Well, the entire Seashore settlement agreement. That was a completely separate transaction, independent . . . Right, but the district court didn't draw any conclusion about it. It didn't say . . . it Well, I think the record speaks for itself. It doesn't need to be said when the . . . The record may speak for itself, but when I look at the record, it looks like it's Perez saying transfer it, so he's got the control over the transfer, and then it's pretty clear that it's all in the interest of Mexico, the Mexican entity, your client. The entire operation, no doubt, for sure. Yeah, but the settlement agreement was between Seahorse and Nexus Ship Mexico, or Nexus Ship Ocean. It was. Well, I mean, again, the district court dealt with none of this. Isn't that clearly erroneous in terms of disregarding those facts or that evidence? No, because the issue is who did the money belong to? That's the issue. Did Nexus Ship Mexico have a claim or have property in the district at the time of the garnishment? Well, what about . . . a similar problem obtains with the district court's denial of the motion for leave to amend. The district court just says, well, based on the record, there's no good cause, no analysis at all, and yet your friends on the other side have come up with all this evidence that, in fact, the reason this is Nexus Ship Texas's account and money is only because these entities are shams, effectively. Alter egos, not shams. Well, there is a heightened pleading and proof requirement for piercing, and they have essentially . . . Yeah, but the district court didn't even allow them to do it and didn't analyze the good cause factors or anything like that under the Rule 15 standard. At the time of the garnishment, when it was done ex parte, it may not have been analyzed, which is why we had the post-seizure hearing and the motion practiced . . . Now, I'm looking at the district court's order from the 22nd of November, 2024. Yes. Denied leave to amend and vacated the garnishment. So, that's not ex parte. That's after the discovery, correct? Correct, but there was no motion as Rule 7 requires, as the local rule requires. But, I mean, they did it in this proposed order. The proposed order is quite long, and the district court engaged the issue. The district court clearly ruled on leave to amend. Well, there was no good cause because the seahorse agreement and the flow of funds was proven and fully explained not to be anything Nexus Ship Mexico other than a deposit . . . Other than that they were the party entering the settlement agreement. But it was an unrelated transaction, and as the court has explained, in the brightest versus government of Turkmenistan case, piercing applies only if the owner exercised complete control over the corporation with respect to the transaction at issue, which is the charter party with Cho, which is a completely separate transaction, and such control was used to commit a fraud or wrong that injured the party seeking to pierce the bill. They didn't even properly allege piercing, but none of those conditions could have been met under any circumstance because we're talking about a completely different transaction involving completely different parties. We're talking about assets to satisfy judgment or an arbitration award, correct, that's in the eight figures? It's security for the arbitration award, which in admiralty they can get prior to the award becoming final if it's Nexus Ship Mexico's property anywhere in the world, but it's not. Without any help from the district court, where in the record can we see a contradiction of Perez's own statements that he's just using the Texas entity as a financing arm? So you sort of have to contradict his own statement that all that Texas entity do is helping finance the Mexican entity's charter arrangements. I'm not sure what the question is, but Mr. Perez provided. The question is, and then another, if I remember, there was an email from him saying that the Texas entity had nothing to do with the seashore deal, and yet now, again, we've got no exploration of this by the district court, but you're suggesting in your brief that actually it was an investor for the Texas entity. The record reference is there are motion to vacate, Mexi Ship Texas motion to vacate is at 436 to 462, which includes Mr. Perez's declaration at 452 to 462, which traces the funds from their beginning, from Mexi term to Texas to the acquisition of a CD, and they were doing other businesses well, obviously well before Choke. Totally separate. Yes, sir. That's your contentious, the district court's never resolved that, because we look at this, we look, I mean, am I correct in the record as they point out, there's simply no delineation of these two companies at all, so it's a Texas loan of close to a million dollars to the Mexican entity, but there's no documentation of that between these two separate entities? That is in the record? Yeah, is there anything in the record, we're sort of groping, because the district court hasn't looked at anything. Well, other than Mr. Perez's unrefuted declaration, I mean, they're working off of a theory, we're working off of facts. Is unrefuted declaration that he uses Texas as the financing arm? For the Seahorse transaction, it was. Okay. For purposes of all sorts of reasons, personal and financial security in Mexico, I'm sure the court is well aware, Mexico is not as safe as we have here in terms of banking and financing, and so, you know, there's a very legitimate reason why Mexican nationals keep their finances elsewhere, and that's exactly what happened, and it's what Mr. Perez explained in his declaration at 452 to 62. The argument about the piercing has never been fled, and MexiShip Texas is not even really a party. We've only made, we've only appeared under Rule E-8 as a restricted appearance. So to the extent that they were going to allege piercing, they can argue it all they want, but it's not there. It's a theory that's looking for a place to land, whereas we've shown that it has no place to land definitively, and we've traced the assets, we've shown conclusively that these funds, the garnished funds, are not belonging to MexiShip Mexico, and moreover, it certainly didn't support the garnishment of all funds in MexiShip Texas's accounts, which is what it is. Seashore refunding the Mexican entity for a charter that never went through. It was an acquisition. It was going to be an acquisition of a vessel. Okay, and they never got the vessel, so the Mexican entity gets its deposit back, it refunds. Well, the financing arm was what was paying it, and the ownership of the two entities is different. The structure is different between the two. Mr. Perez is 100% owner of Texas, but he is only a 67% owner of Mexico. And that's also in the record. One thing that the appellant has done throughout its briefing and, of course, its argument is saying these things are unrefuted, or Mr. Perez conceded this or admitted that. That's not the case. All of this was voluntarily disclosed before we got into the discovery issues. We showed them from the beginning to the end that it did not belong to MexiShip Mexico, that the funds did not belong to MexiShip Mexico. MexiShip Mexico has no claim or interest in the returned funds. And I guess that gets to my question I was asking, what's the best authority, legal authority, because not much was given, none by the district court and not much by you in terms of you've got a bank account. Is it rule B attachable when there are control indicia? Hear Perez saying, I'm going to send it, Perez and the Mexican Indy, to my account in Texas. Why doesn't that sort of create an issue of fact? Because the language of the settlement agreement says for purposes of the receiving the refund, it doesn't say that they are co-equal for all purposes and all reasons. What's the best authority, legal authority, as to when a bank account is rule B attachable? When it belongs to the entity that is seeking to be garnished. You're giving a holding, getting back to what Judge Higginson is asking, there's very little cited for that. What would you cite to us for what you just said as authority? Well, these entities are presumed separate. The name on the bank account is MexiShip Texas. They're presumed separate. What they are essentially doing is using a reverse case. Cases. What authority do you have that shows? I'm sorry. The brightest case, I think, is the leading case out of this circuit regarding the standards for piercing. And, you know, the — We're not trying to pierce. What we're specifically asking here, who owns this account? What is the right to bring this action against that account when the money came in the manner that we've all been discussing factually? So what authority do you have that would help us understand what the rules are that would apply to transactions that sent money to this McAllen bank account in this way? I'm not sure that I understand, but the bank account is in the name of the Texas entity. I guess what we're asking is, is legal title the end of the story or can control demonstrate ownership? And then, of course, here they're pointing to control the district court didn't seem to address, which is Perez and Mexico are sending it there and ostensibly to refund them. So the legal question is, is your position you stop at legal title or can control show ownership? It's not just the legal title. And we've shown how Mexico does not control these funds as well and has no claim to them and had no claim to the CD, which was liquidated as part of this garnishment. Mexico had no claim on any of these funds whatsoever. No, no control, no ownership, no beneficial interest, etc. That was all reflected. But what's your case authority to support that proposition? I don't. Dealing with an attachment of a bank account. Well, I do cite, we do cite Mr. Letourneau's article. I don't know that there's a case necessarily, but, you know, the state of the law is that these entities are presumed separate and different. He may have had, as I said earlier, probable cause at the beginning to say, hey, there's something going on here, but then that's the reason we had the post-garnishment hearing to explain everything. And so I don't think that there's actually any case authority other than to say that owns an account, it's theirs unless somebody proves otherwise and pleads otherwise. And they did not do that. They did not sue MexiShipTexas. They did not plead that MexiShipTexas was part of this fraud. Is it the time of suit when we assess ownership? I would say at the time of garnishment. Because you heard me ask opposing counsel, at the time of the complaint, I don't think the money had yet come into the Texas account. Do you have a? I think it had. You both think it had? I think it had. The garnishment went through two iterations, I believe, before we got even notified of it. But the. What's the status of the Singapore Arbitration Award? I don't know. And I don't know what's going on in Mexico either. One of the Mexican lawyers provided a declaration early on, and you can see that there's cases all over the place. And as I understand it, there's even more cases going on. You don't know the status of the award or the status of the litigation in Mexico. Do you know the status of their boat? One vessel was removed from Mexican waters. Both of them had been flagged under Mexico. And so in order for, as I understand it, in order for them to leave Mexican waters, they have to be reflagged or released by the Mexican authorities. So it's not like what Mr. Letourneau is saying, that we're just stealing vessels, actually. So you'd like to give it back, but the Mexican government isn't letting you? No. There's a dispute over funds that are owed under the arrangement, including whatever's going on here, what's going on in Singapore, et cetera. And so it's out of my scope. I don't know what's Mexico is Mexico and Singapore is Singapore. I'm a licensed American lawyer, so let them deal with it over there. What we're looking at here is the propriety of the garnishment, and that's really it. And under the standards that the court has pronounced for years and followed by other circuits, they have to show something more. Mr. Letourneau, we cite an article that he himself talks about. You have to show something more. You can't just show common ownership or something to say, oh, well, that's good enough. That may have been the state of things 30 years ago. I don't know. But under the current state of the law, in order to pierce, reverse or conventionally, the transaction at issue, I think, is the important thing. And this is a completely separate transaction versus the complaint that Cho has, which is what was at issue in the Singapore arbitration, which is not what was going on with Seahorse. They're completely separate deals. So they say, oh, and the fact that the Seahorse transaction was even disclosed, it was inadvertent. And so they glommed onto it and said, OK, well, now we've got this email that was given to us by mistake, but we know money's coming to Texas, and so let's go get it however we can, pleading and proof be damned. And that's exactly what happened. And then we showed, again, the full flow of everything. And Mexico's hands are not on this money other than through the settlement agreement, as Judge Wilson rightly observed. But again, the language of the settlement agreement says it's for purposes of receiving the refund. There's no relation to Cho whatsoever in Seahorse or that transaction, which predated their dealings, which I think is actually why, because the Seahorse deal fell apart, that may be why MexiShipMexico started talking to Cho to get a replacement vessel. So they are completely separate deals. And most importantly, the appellant makes no allegation of any fraud or wrongdoing by MexiShipTexas, who had the money, has the money. There's not one thing. They're not even a party. And so I don't understand how anybody could say that this is an appropriately postured case for the relief that they got in the outset without having to sue the party that's holding the funds. And so the standard review on this point is abuse of discretion. And we're dealing with a factual conclusion. Whose money is it? Is it MexiShipMexico's money or is it MexiShipTexas' money? The only way to reach the appellant's conclusion that the money is MexiShipMexico's is to endorse a half-baked, piercing argument that they could never make, given that the Seahorse funds had nothing to do with their transaction. And MexiShipTexas was a stranger to the Cho transaction otherwise. And with respect to the second point of error that they've alleged regarding the, they should have been given leave to amend. That's pretty straightforward. There was no motion. There was no showing of good cause. And they misstate the record repeatedly in their reply brief at page two and elsewhere. Mr. Perez has not admitted or conceded anything. We've obviously expressed that he owns the majority of both companies and deposit was sent from Texas. The district court did not ignore anything. We had extensive discovery that went on for months. And we argued about that. We had motion practice about that. Nothing changed. They can't change the reality that the money belongs to MexiShipTexas through MexiTerms gas supply, which was the investor that provided the funds to begin with. So the appellant is seemingly asking the court, this court, to grant it leave to amend to continue phishing when it cannot overcome the evidence we've already produced and the garnished funds don't belong to MexiShipMexico. So amendment to the extent that we could even give their sliding it into that 600-page order, proposed order, as a motion, amendment would have been futile because nothing they could have said would have changed what we proved was that the money belonged to MexiShipTexas. And so for those reasons, we respectfully ask the court to affirm the district court's order vacating the garnishment. All right, counsel. Thank you. Your Honor, I'd just like to bring to your attention a couple of things. First, it's important to keep in mind that this has been a battle. This has not been voluntary disclosures. We ended up having numerous hearings before the magistrate's judge trying to get whatever it is that we got, and the scope of discovery was quite limited. And the magistrate was very frustrated. He was very frustrated, yes. I will say, too, that there's been misrepresentations by MexiShipMexico and MexiShipTexas in this case. They asserted in sworn verifications, they asserted MexiShipMexico and MexiShipTexas, quote, do not do business together and are not engaged in any joint venture, partnership, or other undertakings with each other. As such, there are no financial transfers, loans, guarantees, et cetera, with, for, by, or between each other, unquote. And then if you go to Mr. Perez's deposition, it's on ROA-1707, and the question was, and its financiers, who are the charter's financiers for purposes of this statement? Answer, well, precisely, and it's, you know, it's as simple as that. You know, we're looking at all these emails, and I can simply, simplify it quickly so you can understand it once and for all. What MexiTerm Gas gave to MexiTerm Texas, I think he meant MexiShipTexas, so they could finance their operation with MexiShipMexico. So it served like as a financing arm, like a, like a, like a loan. You know, it's that simple. It's not that complex. That completely contradicts those interrogatory responses that were sworn under oath. That's the kind of defendant that we're dealing with in this case. And with respect to the allegations, if we had been given the opportunity to plead after we had done discovery, we would have done so. MexiShipTexas was formed on April 18, 2023. The timing of MexiShipTexas' formation is no coincidence. CHO applied for a partial final award in Singapore for its unpaid charter hire. MexiShip basically refused to participate in that arbitration process, which they agreed to under their bareboat charter, and that's at ROA 194. That happened on 6 March, 2023. On April 17, 2023, the Singapore arbitrator held an administrative hearing on CHO's unpaid hire application, and that's at ROA 200. Essentially, that timing of, of MexiShipTexas' creation, Perez's actions indicate that he formed MexiShipTexas to allow MexiShipMexico to continue operating unfunded, undercapitalized, to shield MexiShipMexico from the arbitration awards. MexiShipTexas was formed and used, we believe, in part in an attempt to render MexiShipMexico judgment proof. But that's a theory. You don't have evidence showing that. No, but we do have, we do have the timing of that creation of that entity. And we have, we also have the fact that they have, they have lied during the course of this proceeding, trying to conceal what it is that they were engaged in. And we also have evidence from our own client whose vessel has not been released and is still being used for, by MexiShipMexico in Mexican waters. And we had the attempt by MexiShipMexico to obtain another vessel using, under fraudulent pretenses. All of that is indicative of the fact that these are not legitimate companies. We should have had the opportunity to amend our pleadings, to pursue our claims. And the, I think the answer to your question, Judge Higginson, with respect to, you know, what do we look to? We look to a final definitive decision by the court whether or not the monies were owed or owned by MexiShipTexas or MexiShipMexico. And that would come at the conclusion of the allegations, of the trial proceedings. So our, our contention is we have sufficient evidence that we should be entitled to go forward. We believe that the Seahorse Settlement Agreement is sufficient evidence to demonstrate ownership of those monies by MexiShipMexico. And all of the communications by Mr. Perez to Seahorse during that period demonstrate that they believe that those monies belong to MexiShipMexico. All right, Counsel. Thanks to you both. You have certainly presented a challenging set of facts for us to be dealing with. Thank you, Your Honor. We'll take this case under advisement.